UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | : CHAPTER 11 |
| | : |
| **SCHOOL SPECIALTY, INC., et al[1]**. | : |
| Debtors | : Case No. 13-10125 (KJC) |
| | : (Re: D.I. 475) |

# MEMORANDUM[2]

**BY: KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE**

On January 28, 2013 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. On January 31, 2013, this Court issued an order (the "Interim DIP Order") (D.I. 86) approving interim debtor-in-possession financing. The Interim DIP Order granted super priority liens and adequate protection (including pre- and post-petition interest) to Bayside Finance, LLC ("Bayside" or the "Claimant"). Under the Interim DIP Order, the Debtors stipulated that they were liable to Bayside in the aggregate principal amount of $95,024,001.06. The principal amount includes an "Early Payment Fee" of approximately $23.7 million (the "Make Whole Payment").

On February 5, 2013, the United States Trustee for the District of Delaware appointed the Official Committee of Unsecured Creditors (the "Committee"). The Committee filed an amended Motion to Disallow Bayside's Make Whole Payment (the "Motion to Disallow") (D.I. 475) on March 6, 2013. Bayside filed an objection to the Motion to Disallow on March 22, 2013

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: School Specialty, Inc. (1239); Bird-In-Hand Woodworks, Inc. (8811); Califone International, Inc. (3578); Childcraft Education Corp. (9818); ClassroomDirect.com, LLC (2425); Delta Education, LLC (8764); Frey Scientific, Inc. (3771); Premier Agendas, Inc. (1380); Sax Arts & Crafts, Inc. (6436); and Sportime, LLC (6939).

[2] This Memorandum constitutes the findings of fact and conclusions of law, as required by Fed.R.Bankr.P. 7052. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and §157(a). This contested matter involves a core proceeding pursuant to 28 U.S.C. §§ 157(b)(1) and (b)(2)(B).

(D.I. 638). A hearing was held on April 5, 2013. For the reasons that follow, the Motion to Disallow will be denied.

## Facts

On May 22, 2012, the Debtors entered into a credit agreement (the "Term Loan Credit Agreement") (Ex. 4)[3] with Bayside, as administrative agent, collateral agent, and the sole lender. Under the Term Loan Credit Agreement, Bayside agreed to make a term loan (the "Term Loan") in the aggregate principal amount of $70 million, at an annual rate equal to the three-month LIBOR, with a 1.5% floor, plus 11.0%. The Term Loan Credit Agreement was to mature on October 31, 2014 (the "Initial Maturity Date"), unless the Debtors were able to refinance certain 3.75% Convertible Subordinated Debentures due 2026 (issued on March 1, 2011). Upon refinancing, the Term Loan Credit Agreement would mature on December 31, 2015 (the "Convertible Maturity Date").[4]

Upon either prepayment or acceleration of the Term Loan, the Debtors were required to pay an "Early Payment Fee." If the prepayment or acceleration occurs during the first year and a half of the Term Loan (the "Limited Call Period"), the Early Payment Fee is equal to the Make Whole Payment. (Ex. 4 at 48). The Make Whole Payment is calculated by discounting the future stream of interest payments between the date on which the principal is prepaid or accelerated and the Conditional Maturity Date of December 31, 2015. (Ex. 4 at 22-23, 48). The discount rate set forth in the agreement is the applicable Treasury rate plus 50 basis points. (*Id.* at 23-24).

The Early Payment Fee calculation includes a "step-down mechanic" that reduces the amount of the fee after 18 months and, further still, after 30 months. (Ex. 4 at 48). If the

---

[3] At the April 5, 2013 hearing, the parties submitted a joint binder of exhibits (1-55) that was admitted into evidence.

[4] The outstanding principal amount due to the debenture holders as of the Petition Date was approximately $157.5 million.

prepayment occurs after the 18th month, but before the end of the 30th month, the amount of the Early Prepayment Fee is fixed at 6% of the outstanding principal. (*Id.* at 48). The percentage decreases to 1% after the 30th month. (*Id.*).

On January 4, 2013, Bayside entered into a forbearance agreement (the "Forbearance Agreement") (D.I. 638, Ex. D) with the Debtors. In the Forbearance Agreement, the Debtors acknowledged their breach of a covenant in the Term Loan Credit Agreement that required minimum liquidity of $20 million (the "Minimum Liquidity Covenant") as of December 29, 2012. (*Id.*, Ex. D, Annex A). The Committee does not dispute that the breach of the Minimum Liquidity Covenant occurred, triggering the Debtors' obligation for the Make Whole Payment.

The Forbearance Agreement reflected the acceleration of the Term Loan which made all outstanding principal and unpaid interest, including the Make Whole Payment, due and payable. The Forbearance Agreement provides that, as of January 4, 2013, the aggregate principal amount of the Term Loan was $67,000,000.00, the amount of the accrued and unpaid interest was $1,605,208.33, and the Make Whole Payment was $25,054,001.06. (*Id.*, Ex. D, Art. II). Thereafter, the Make Whole Payment was re-calculated by Bayside to be $23.7 million.[5] This revised amount reflects the present value of interest payments through December 2015.

---

[5] Although the Forbearance Agreement states that the Make Whole Payment is $25,054,001.06, the parties have agreed that the actual amount of the Make Whole Payment is approximately $23.7 million. This reduced amount reflects the interest received by Bayside from January 4, 2013 (the date of acceleration) through February 28, 2013 (the date upon which the Term Loan principal was paid in full). (Ex. 3 at 11).

3

## Legal Standard

"The 'basic federal rule' in bankruptcy is that state law governs the substance of claims . . . Congress having 'generally left the determination of property rights in the assets of a bankrupt's estate to state law . . . .'" *Raleigh v. Illinois Dept. of Revenue,* 530 U.S. 15, 120 S.Ct. 1951, 147 L.Ed. 2d 13 (2000). The inquiry into whether a prepayment provision will be enforced in bankruptcy begins with whether the prepayment provision is enforceable under applicable state law. 11 U.S.C. §502(b)(1); *United Merchs. & Mfrs. v. Equitable Life Assurance Soc'y of the U.S. (In re United Merchs. & Mfrs.),* 674 F.2d 134, 141 (2d Cir. 1982) (whether a liquidated damages provision in a contract is an unenforceable penalty is a question of state law). The parties agree that New York law governs the Term Loan Credit Agreement and the Make Whole Payment provision.[6]

Under New York law, prepayment provisions and early termination fees are analyzed under the standards applicable to liquidated damages. *See JMD Holding Corp. v. Cong. Fin. Corp.,* 4 N.Y. 3d 373, 379-80, 828 N.E.2d 604 (2005) ("[w]hether the early termination fee represents an enforceable liquidation of damages or an unenforceable penalty is a question of law, giving due consideration to the nature of the contract and the circumstances" (citing *Mosler*

---

[6] The parties dispute upon whom the burden of persuasion rests in this matter. Under New York law, the party challenging the Make Whole Payment bears the burden of persuasion that it should not be allowed. *JMD Holding Corp. v. Congress Fin. Corp.,* 4 N.Y.3d 373, 380, 828 N.E.2d 604 (2005) ("The burden is on the party seeking to avoid liquidated damages . . . to show that the stated liquidated damages are, in fact, a penalty.")

    The Committee asserts that the long-standing rule announced by the Third Circuit Court of Appeals in *In re Allegheny Int'l, Inc.,* 954 F.2d 167, 173 (3d Cir. 1992) applies, requiring, ultimately, that the claimant - - Bayside - - prove its entitlement to the Make Whole Payment. Bayside disagrees, citing the United States Supreme Court decision in *Raleigh v. Illinois Dept. of Revenue,* 530 U.S. 15, 120 S.Ct. 1951, 147 L.Ed. 2d 13 (2000), holding that if a tax law places the burden of proof on a taxpayer - - as opposed to the government - - that burden remains the same in bankruptcy court. The Committee argues that *Raleigh* is limited to situations involving tax claims. I need not decide this issue since, as discussed below, Bayside, on this record, has demonstrated its entitlement to the Make Whole Payment.

4

*Safe Co. v. Maiden Lane Safe Deposit Co.*, 199 N.Y. 479, 485, 93 N.E. 81 (1910); *Leasing Serv. Corp. v. Justice*, 673 F.2d 70, 74 (2d Cir. 1982)). New York courts will consider a prepayment premium to be enforceable when (i) actual damages are difficult to determine, and (ii) the sum stipulated is not "plainly disproportionate" to the possible loss. *In re South Side House, LLC*, 451 B.R. 248, 270 (Bankr. E.D.N.Y. 2011) (citing *United Merchs.*, 674 F.2d at 142). The reasonableness of the damages is determined as of the time the parties entered into the agreement and not at the time of the breach. *Walter E. Heller & Co., Inc. v. Am. Flyers Airline Corp.*, 459 F.2d 896, 898-99 (2d Cir. 1972)(citations omitted).

Further, New York courts have cautioned against interfering with parties' agreements. *JMD Holding*, 4 N.Y.3d at 380-81 citing *Fifty States Mgt. Corp. v. Pioneer Auto Parks*, 46 N.Y.2d 573, 577, 415 N.Y.S.2d 800, 389 N.E.2d 113 (1979) ("Absent some element of fraud, exploitive over-reaching or unconscionable conduct ... to exploit a technical breach, there is no warrant, either in law or equity, for a court to refuse enforcement of the agreement of the parties"); *cf.* 3 Farnsworth, Contracts § 12.18, at 303–304 (3d ed) ("(I)t has become increasingly difficult to justify the peculiar historical distinction between liquidated damages and penalties. Today the trend favors freedom of contract through the enforcement of stipulated damage provisions as long as they do not clearly disregard the principle of compensation"); *see also XCO Intl. Inc. v. Pacific Scientific Co.*, 369 F.3d 998, 1002–1003 (7th Cir.2004) ("The rule (against penalty clauses) hangs on, but is chastened by an emerging presumption against interpreting liquidated damages clauses as penalty clauses") ). *See also GFI Brokers, LLC v. Santana*, 2009 WL 2482130, *2 (S.D.N.Y. 2009) (citing same).

The Committee's main argument is that the Make Whole Payment does not meet the second prong of the test for liquidated damage provisions: i.e., the Committee argues that the

formula used to calculate the Make Whole Payment is not in accord with usual "market place" formulas and results in a prepayment premium that is "grossly disproportionate" to Bayside's possible loss, as reasonably projected at the time the Term Loan Credit Agreement was signed. (Reply Br., D.I. 734, at 7).

## Discussion

(1) *Whether the Make Whole Payment is 'plainly disproportionate' to Bayside's possible loss?*

When exercising an option to accelerate a loan, "the lender elects 'to give up [its] future income stream in favor of having an immediate right to collect [its] entire debt.'" *South Side House,* 451 B.R. at 268 quoting *In re Solutia, Inc.,* 379 B.R. 473, 488 (Bankr. S.D.N.Y. 2007). The purpose of prepayment consideration is to compensate the lender for the loss of its bargained-for yield. *South Side House,* 451 B.R. at 267.

When determining whether a prepayment penalty is 'plainly disproportionate' to a lender's probable loss, courts interpreting New York law have considered (i) whether the prepayment fee is calculated so that the lender will receive its bargained-for yield, and (ii) whether the prepayment fee is the result of an arms-length transaction between represented sophisticated parties. *South Side House,* 451 B.R. at 270-71 (citing *In re Vanderveer Estates Holdings, Inc.,* 283 B.R. 122, 130 (Bankr. E.D.N.Y. 2002)).

a. *Did the lender receive its bargained for yield?*

The Committee argues that the Make Whole Payment was calculated such that it inflates Bayside's actual losses and is inconsistent with market precedent. According to the Committee and its expert, the Make Whole Payment calculation should have included discounted interest payments for only the first 18 months. (Ex. 7 at 11; Tr. at 33-34). The Committee downplays the likelihood of a possible refinancing prior to October 31, 2014. However, because this

refinancing option remained available throughout the life of the Term Loan, Bayside was obligated to keep the funds available through 2015. Thus, Bayside was justified in using the Conditional Maturity Date of December 31, 2015 to calculate the Make Whole Payment.

This determination is consistent with the New York Court of Appeals' holding in *JMD Holding*. In *JMD Holding*, the parties entered into a loan agreement for a $40 million revolving credit facility. *JMD Holding*, 4 N.Y.3d at 376. The prepayment fee was calculated using the entire $40 million available credit, even though the obligor did not draw upon the full amount. *Id.* at 377. The obligor argued that the fee was disproportionate to the lender's expected yield because there was no guarantee that the maximum amount would be borrowed. However, the Court held that the fee was appropriate because the lender made a commitment to extend credit up to $40 million. The lender's subsequent lending behavior had to be conducted to insure that the full $40 million was available to be drawn upon. *Id.* at 383.

Similar facts exist here. Although there was no guarantee that the Term Loan would be extended to December 2015, Bayside was required to plan its lending activity in such a way to account for the possibility of the loan being extended. The Committee's argument that an extension was unlikely is irrelevant. The Term Loan Credit Agreement required Bayside and its investors to keep adequate funds available through December 2015. The Court cannot, with the benefit of hindsight, alter the agreement based on subsequent operational results and managerial decisions.[7]

---

[7] Sean Britain, a principal at Bayside, testified that Bayside's goal on this type of loan is to achieve a return to its investors of between 1.4 and 1.5 times investment. (Tr. at 94). It is not disputed that the Make Whole Payment achieves this targeted return.

The Committee makes much of the fact that the Make Whole Payment is 37% of the Term Loan. This, certainly, is a figure to give the Court pause. However, the applicable standard by which the Court is bound to evaluate whether Bayside is entitled to receive the Make Whole Payment is whether the payment is "plainly disproportionate" to the possible loss - - not whether the payment at issue is disproportionate to the principal of the loan.

7

Moreover, the Make Whole Payment is calculated by discounting future interest payments using an interest rate tied to Treasury Note performance. (Ex. 4 at 23). Other New York courts have determined that prepayment consideration calculated on the basis of U.S. Treasury bond interest rates supports the conclusion that a prepayment premium is not plainly disproportionate to a lender's potential losses. *South Side House,* 451 B.R. at 271 citing *In re Saint Vincent's Catholic Med. Ctrs. of N.Y.,* 440 B.R. 587, 594 (Bankr.S.D.N.Y. 2010); *Vanderveer,* 382 B.R. at 130-31.[8]

  b. *Was the Term Loan an arms-length transaction?*

The Debtors received proposals from multiple lenders that contained varied terms. After Bayside was selected, the Debtors further negotiated terms and conditions of the Term Loan including the prepayment terms. (Ex. 3 at 8-10; Tr. at 81, 87-88, ). Here, it is not seriously disputed that the company was experiencing financial distress at the time the Term Loan was negotiated, but there is no credible evidence in the record revealing that the relative strengths or weaknesses of the parties' respective bargaining positions was anything but common under the circumstances. The evidence presented at trial shows clearly that the Term Loan was the result of an arms-length negotiation.

---

[8] In *Vanderveer,* the Court wrote: "[The yield maintenance provision] is calculated based on prevailing Treasury Bond yields at or about the time of prepayment, and is structured to permit the lender, in the event of prepayment, to receive its bargained for yield while reinvesting the prepaid funds in the U.S. Treasury instruments. The yield maintenance provision at issue does not result in an automatic premium to the lender in the event of prepayment." *Vanderveer,* 283 B.R. at 130. *See also Anchor Resolution Corp. v. State Street Bank and Trust Co. of Connecticut (In re Anchor Resolution Corp.),* 221 B.R. 330, 341 (Bankr.D.Del. 1998) (deciding that a make whole forumula was reasonable when it "accounts for changes in the Treasury rate, decreases over time, and has no applicable 'minimum charge'").

*(2) Whether Section 506(b)'s reasonableness standard applies to pre-petition fees?*

The Committee claims that the Make Whole Payment must also pass the reasonableness standard in Bankruptcy Code §506(b).[9] Bayside counters that §506(b) applies only to post-petition fees, costs or charges. *Compare In re 400 Walnut Assoc., Inc.,* 473 B.R. 603, 610 (E.D.Pa. 2012) ("The majority view is that §506(b) does not apply to interest and other charges that accrue *before* the filing of the bankruptcy petition.") (emphasis in original) citing *inter alia Collier on Bankruptcy* ¶506.04 [1] (16th ed. 2012) ("The allowability of . . . prepetition amounts as part of the secured creditor's 'claim' is not determined by section 506, but is governed by section 502 in conjunction with other provisions of the Code.") *with Wetzel v. Advocate Realty Inv., LLC,* 275 F.3d 1308, 1318 (11th Cir. 2001) (applying the reasonableness standard of §506(b) to unpaid attorney fees that the creditor incurred both prepetition and post-petition, deciding that §502 and §506 "should be read in tandem with one another," as § 502 deals with the threshold question of whether a claim should be allowed or disallowed, then §506 deals with the narrow issue of whether certain types of claims should be considered secured or unsecured) *cited in* 4-506 *Collier on Bankruptcy* ¶506.04 [3][e] (16th ed. 2013).

Under New York law, a prepayment premium must not be an unenforceable penalty; therefore the §506(b) reasonable standard may be met in any event. I have determined that the Make Whole Payment is not "plainly disproportionate" to the lender's probable loss. On the

---

[9] 11 U.S.C. §506(b) provides:
    (b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and **any reasonable fees, costs, or charges provided for under the agreement** or State statute under which such claim arose.

record before me, even assuming §506(b) applies, the Make Whole Payment meets the §506(b) reasonableness standard.

(3) *Whether the Make Whole Payment is unmatured interest under Section 502(b)(2)?*

The Committee next asks the Court to disallow the Make Whole Payment under Section 502(b)(2) because it constitutes a claim for unmatured interest.[10] The Committee's claim is that the Make Whole Payment is intended to compensate Bayside for lost future interest resulting from the prepayment.

My colleague, Judge Shannon, recently noted that bankruptcy courts are split on the issue of whether make whole payments are characterized as unmatured interest or liquidated damages. *In re Trico Marine Servs., Inc.,* 450 B.R. 474 (Bankr.D.Del. 2011). He reasoned:

> Research reveals that the substantial majority of courts considering this issue have concluded that make-whole or prepayment obligations are in the nature of liquidated damages rather than unmatured interest, whereas courts taking a contrary approach are distinctly in the minority. *Noonan v. Fremont Fin. (In re Lappin Elec. Co.),* 245 B.R. 326, 330 (Bankr.E.D.Wis.2000) ( "[T]his court is in agreement with a majority of courts that view a prepayment charge as liquidated damages, not as unmatured interest or an alternative means of paying under the contract.") (citations omitted); *see also In re Outdoor Sports Headquarters, Inc.,* 161 B.R. 414, 424 (Bankr.S.D.Ohio 1993) ("Prepayment amounts, although often computed as being interest that would have been received through the life of a loan, do not constitute unmatured interest because they fully mature pursuant to the provisions of the contract.") (citations omitted); *In re Skyler Ridge,* 80 B.R. 500, 508 (Bankr.C.D.Cal.1987) ("Liquidated damages, including prepayment premiums, fully mature at the time of breach, and do not represent unmatured interest.") (citation omitted).

*Trico Marine,* 450 B.R. at 480-81. Judge Shannon was "persuaded by the soundness of the majority's interpretation of make-whole obligations," and concluded a claim for a make whole premium was akin to a claim for liquidated damages, not a claim for unmatured interest. *Id.* at

---

[10] 11 U.S.C. §502(b)(2) provides, in pertinent part:
  (b) [If an] objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that - -
  . . . .
    (2)   such claim is for unmatured interest.

481. I agree with Judge Shannon and likewise conclude that the Make Whole Payment claimed by Bayside should not be disallowed as unmatured interest under Section 506(b)(2).

(4) *Whether Bayside had a duty to mitigate damages?*

The Committee also contends that Bayside had a duty to mitigate any damages it suffered. However, New York courts have held that a valid liquidated damages claim obviates the duty to mitigate. *Delvecchio v. Bayside Chrysler Plymouth Jeep Eagle, Inc.*, 271 A.D.2d 636, 639, 706 N.Y.S.2d 724 (2d Dep't 2000) citing *Truck Rent-A-Center v. Puritan Farms 2nd*, 51 A.D.2d 786, 380 N.Y.S.2d 37, *aff'd.* 41 N.Y.2d 420, 393 N.Y.S.2d 365, 361 N.E.2d 1015, *Musman v. Modern Deb*, 50 A.D.2d 761, 377 N.Y.S.2d 17 (1975).[11]

## Conclusion

The Motion to Disallow will be denied. An appropriate order follows.

BY THE COURT:

_____
KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT

DATED: April 22, 2013

---

[11] Mr. Britain testified that, with respect to the particular Bayside fund that is the lender here (H.I.G. Bayside Debt and LBO Fund II, LP) Bayside was prevented from reinvesting prepayment proceeds, as Bayside was obligated to return the proceeds to its limited partners within ninety days of receiving them. (Tr. at 77). Therefore, the evidence demonstrates that Bayside was prevented contractually from mitigating its damages.